**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF OKLAHOMA**

| | |
|---|---|
| (1) SHANTA ISOM, INDIVIDUALLY AND AS MOTHER AND NEXT FRIEND OF HER MINOR CHILD, J.I., <br><br> PLAINTIFF, <br><br> v. <br><br> (1) INDEPENDENT SCHOOL DISTRICT NUMBER ONE OF TULSA COUNTY OKLAHOMA d/b/a TULSA PUBLIC SCHOOLS and <br><br> (2) NICHOLAS STOWELL, <br><br> DEFENDANTS. | CIVIL ACTION NO.: 26-cv-00069-MTS <br><br> <u>**JURY DEMAND**</u> |

<u>**COMPLAINT**</u>

Plaintiff SHANTA ISOM, individually and as the adoptive mother and next friend of minor child J.I., by and through her undersigned counsel, brings this action for damages against Defendants INDEPENDENT SCHOOL DISTRICT NUMBER ONE OF TULSA COUNTY, OKLAHOMA d/b/a TULSA PUBLIC SCHOOLS and NICHOLAS STOWELL, the latter in his individual capacity, for violations of federal law. In support of her claims, Plaintiff respectfully alleges the following:

## I.    INTRODUCTION

1.    On February 9, 2024, Nicholas Stowell, a teaching assistant at Wayman Tisdale Fine Arts Academy (hereinafter "Wayman Tisdale" or "the School") brutally attacked J.I., a first grader with special needs, on a school playground during recess. J.I. was playing with his peers when Stowell walked up to J.I. and dragged him across the playground. He then slammed J.I. onto

1

a bench, pushed J.I. back down when he attempted to escape the assault, and then slammed him down again onto the bench, placing J.I. in a violent, apparent headlock—until J.I. was able to free himself. Only after Stowell placed J.I. in the headlock did one of the several adults who witnessed the attack step in to intervene, approaching Stowell, leading to J.I.'s release. Another adult then approached J.I. and carried the small child away to safety. Other Wayman Tisdale employees witnessed the gruesome attack and did not react—they simply looked on as the horrific scene unfolded. Security cameras captured Stowell's attack of the child. Stowell was immediately arrested and charged with felony child abuse and resisting arrest. He later pled guilty and is currently serving a non-custodial sentence.

2.        The attack traumatized J.I. emotionally and physically.

3.        Instead of immediately notifying the student's guardian and providing attention and support, the School—and Tulsa Public Schools (hereinafter "TPS" or the "School District")— covered up the attack in an effort to avoid public fallout and took no steps to redress the harm it had inflicted on the child.

4.        That afternoon, J.I. was sent home from school in the normal course. No one told Ms. Isom that he had been attacked. But TPS nevertheless issued a press statement that same day stating that "there is nothing we take more seriously than the safety and wellbeing of our students." This representation proved to be blatantly false.

5.        J.I. was diagnosed with autism spectrum disorder (ASD), attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and anxiety (the "Disabilities"). When he was brutalized by a school employee, J.I. was settling into life with Ms. Isom after a turbulent childhood in foster care.

6.        Defendant TPS is the largest school district in Oklahoma and serves roughly 33,000 students. Wayman Tisdale is an elementary school within TPS.

2

7.      In the two years since the attack, TPS has faced no consequences for the assault or its systemic failure to meet J.I.'s needs and the needs of the thousands of other special needs students in its care.  It is this culture of abuse and neglect of TPS's most vulnerable children that allowed Stowell's assault to take place.

8.      Despite its public representations to the contrary, TPS systematically fails to accommodate students with disabilities in need of special education services.  TPS purports to serve these students yet has been rated as "in need of substantial intervention" by state special education services authorities after failing to meet baseline state and federal standards last year.[1] Progress has not been made, placing TPS's special needs students at ongoing risk.

9.      TPS's failures were exemplified on February 9, 2024, when Defendant Stowell, then a teaching assistant at TPS, assaulted the diminutive 7-year-old adoptive son of Ms. Isom and dragged the boy's limp body across Wayman Tisdale's playground.

10.      Furthermore, TPS is consistently deficient in its obligations to special needs students, including by failing to implement adequate Individualized Education Programs ("IEPs") and essential educational and behavioral supports, failing to adequately train and supervise its staff responsible for the care of special needs students, and disproportionately physically victimizing these students.  As a consequence of these systemic failures, J.I. was manhandled, dragged, and brutalized by a TPS employee while other staff members looked on and did not intervene.

11.      TPS's mistreatment of J.I. continued even after the attack.  TPS ignored its obligation to inform J.I.'s guardian, provided no support or attention to him and his family after

---

[1] Jeromee Scot, *Tulsa Public Schools overhauls special education after noncompliance*, News on 6 (May 22, 2025, 6:55 AM), newson6.com/story/682ee9abb76d51d553034006/tulsa-public- schools-special-education-overhaul.  *See also* Special Educ. Services, Okla. State Dep't of Educ., *General Supervision System Manual* (Oct. 2025), oklahoma.gov/content/dam/ok/en/osde/ documents/services/special-education/General%20Supervision%20System.

he had been victimized, and did nothing to provide him with the accommodations necessary to facilitate his return to Wayman Tisdale.

12.    Instead, TPS attempted to escape its statutorily mandated responsibility to provide equal access to its facilities and education to all students, regardless of their disability status.  TPS simply left J.I. to suffer from the trauma of the assault without accommodation or any regard for his ongoing educational, behavioral, and emotional needs.  Among other consequences from the assault, J.I.'s disabilities—particularly his posttraumatic stress disorder—were exacerbated by the additional trauma the assault inflicted.  Ms. Isom, on behalf of her adopted son, brings this lawsuit to vindicate the rights of J.I. and to prevent TPS from causing any other student the trauma of being criminally abused at school.

## II.    JURISDICTION AND VENUE

13.    This Court has personal jurisdiction over Defendant TPS because Defendant TPS is domiciled in Tulsa County, located in the Northern District of Oklahoma.

14.    This Court has personal jurisdiction over Defendant Stowell because Defendant Stowell is domiciled in Osage County, located in the Northern District of Oklahoma.

15.    This action arises under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, to prevent disability-based discrimination by public entities,   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, to prevent disability-based discrimination by recipients of Federal financial assistance, and the Fourth and Fourteenth Amendments of the U.S. Constitution pursuant to The Federal Civil Rights Act, 42 U.S.C. § 1983, to prevent the use of excessive force and unreasonable seizures.  This Court has subject matter jurisdiction for these federal claims pursuant to 28 U.S.C. § 1331.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  All parties are located or reside within the Northern District of Oklahoma, and the events giving rise to this Complaint

occurred within the Northern District of Oklahoma.

### III.    THE PARTIES

17.     Plaintiff J.I. is a minor and has been a student in the Tulsa Public Schools since 2023.  J.I. is a resident of Tulsa County in the State of Oklahoma.  J.I. is Black.  At the time of his assault, J.I. was seven years old and a first-grade student at Wayman Tisdale, a public school operating under the control and supervision of Defendant TPS.

18.     J.I. qualifies as an "individual with a disability" within the meaning of § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) ("§ 504"), and Title II of the Americans with Disabilities Act (42 U.S.C. § 12131(2)).  J.I. has been diagnosed with autism, ADHD, anxiety, and PTSD.  His Disabilities substantially limit his ability to perform one or more major life activities, and he is a child who, with or without a reasonable modification of educational program requirements, meets the essential eligibility requirement for the receipt of special education services provided by Defendant TPS.

19.     Plaintiff Shanta Isom is a resident of Tulsa County in the State of Oklahoma.  Ms. Isom is the adoptive mother and biological grandmother of J.I.  Ms. Isom was granted a Final Decree of Adoption for J.I. on July 25, 2024.  At the time of J.I.'s assault, Ms. Isom was J.I.'s legal guardian.

20.     Defendant TPS is an independent school district with its facilities and schools located in Tulsa County in the State of Oklahoma.  TPS is a political subdivision of the State of Oklahoma and is a recipient of federal funding.

21.     Defendant Nicholas Stowell is a resident of Osage County in the State of Oklahoma.  At the time Stowell assaulted J.I., he was employed at Wayman Tisdale, a public school operating under the control and supervision of Defendant TPS.

## IV.    STATEMENT OF FACTS

**A.    On February 9, 2024, Defendant Stowell Assaulted J.I. at Wayman Tisdale.**

22.    The day of J.I.'s assault started as a regular school day.  Video footage captured by the School's security cameras shows the moments leading up to Stowell's assault on J.I.

23.    On Friday, February 9, 2024, J.I. and his classmates were playing on the West playground at Wayman Tisdale in the presence of teachers and staff, including Defendant Stowell, then a teaching assistant at the School.  Some students played on a set of large, colorful playsets with slides, bridges, and monkey bars.  Other students ran around or sat at long green picnic tables next to the playset.  Staff stood or sat in various areas around the playground, watching or interacting with students.

24.    Defendant Stowell stood at one end of the playground, holding a white container (likely a drink cup) and looking out over the children.  At 11:35 a.m., J.I. and another classmate were playing around the end of the playground opposite Stowell.  J.I. ran behind his classmate, underneath the large playset, and out of view of the camera.  J.I. was playing with his peers and there was no indication that he posed a threat to any of the students around him.  Unprompted, Defendant Stowell walked over and peered underneath the playset in J.I.'s direction.  Defendant Stowell then walked behind the playset, out of view, and reappeared behind the yellow bars of the playset's bridge, closer to the other side of the playground.  A minute later, he walked back behind the playset again, toward the direction he was originally standing, again, out of view of the camera.

25.    The security footage shows that a few seconds later, Defendant Stowell emerged from behind the playground, dragging J.I. by the arm.  J.I.'s body was flush with the ground.  He was completely limp, as though lifeless.  No longer holding the white container, Stowell dragged J.I. quickly from behind the playset, over to the long, green picnic benches bordering the playground, near where the other adults were sitting.  At the time of the attack, J.I. was 4' 1" tall

and weighed roughly 55 pounds.

26.     Video footage shows that Defendant Stowell positioned himself at one end of the bench and then lifted J.I. off the ground and threw him forcefully down onto the bench.

27.     J.I. moved to stand up and escape, but Defendant Stowell again violently shoved him down onto the bench and then sat down behind him.

28.     Defendant Stowell's arms immediately wrapped around J.I.'s upper chest and neck area in an apparent headlock while J.I. desperately struggled against Defendant Stowell.  While attempting to break free, J.I. kicked his legs in the air on either side of the picnic bench and appeared to be calling for help.  Despite at least seven School staff standing on the playground, no one made any move to stop Stowell and help J.I.  The child struggled against Stowell's headlock for approximately another ten seconds.

29.     Finally, the video footage shows an adult wearing all black approached Stowell from the other end of the picnic bench and appeared to say something to him.  At this moment, J.I. was able to escape from Stowell's grasp, and tried to hit Stowell once he was out of the headlock. A few seconds later, a Wayman Tisdale staff member in a red shirt walked over quickly, picked J.I. up, and carried him off the playground and out of view.

30.     None of the teachers and staff on the playground reacted to the assault.  Only one staff member in the security footage, looking clearly distraught, acted to remove J.I. from the playground and Defendant Stowell's grasp.  After J.I. was removed from the playground, the adults on the playground acted as though nothing happened, seemingly unsurprised by their colleague's violent attack of a student.  Their reactions, or lack thereof, suggest that this kind of physical abuse has been normalized at the School.  While Stowell's attack on J.I. was captured on camera, it is impossible to know how many instances of abuse are not documented.

31.     Thirty to forty other children on the playground witnessed Stowell's attack of J.I.

They also watched their teachers fail to intervene and then ignore the abuse after J.I. was taken away. The staff's behavior communicated to these children that Stowell's attack was permissible. The message to them was clear: this could happen to you.

**1.     Defendant Stowell Was Arrested by the Tulsa Public Schools Police Department the Same Day and Formally Charged with a Felony.**

32.    Upon information and belief, the Tulsa Public Schools Police Department was called to Wayman Tisdale following Defendant Stowell's assault on J.I. A TPS resource officer arrested Defendant Stowell. Defendant Stowell was taken into custody at the Tulsa County Jail and released the same day, February 9, 2024, on $55,000 bail.

33.    Defendant Stowell was formally charged with child abuse, pursuant to 21 O.S. 843.5A, and resisting arrest, pursuant to 21 O.S. 268, on February 23, 2024 by the District Attorney for Tulsa County, in *State of Oklahoma v. Nicholas Stowell*, Case No. CF-2024-0792. The charging document filed in Defendant Stowell's criminal case describes Defendant Stowell as "unlawfully and willfully or maliciously using unreasonable force upon one J.I., a 7-year-old male child, thereby using excessive force by dragging and/or shoving and/or slamming J.I." It added that Defendant Stowell "is a person responsible for [J.I.'s] health, safety, and welfare."

34.    On August 5, 2024, Defendant Stowell pled guilty to felony child abuse. Defendant Stowell was sentenced to a six-year term of probation during which he is prohibited from teaching or working with children.

35.    Defendant Stowell's actions also violated Okla. Admin. Code § 210:15-13-9 (2020), which prohibits the use of corporal punishment against disabled students.

36.    Upon information and belief, neither the state nor TPS has conducted any independent investigation of Defendant Stowell's assault on J.I., other than to pass the matter to the criminal authorities.

**B.    TPS Tried to Cover Up Stowell's Assault on J.I.**

37.    Despite the assault and the arrest of its staff member, Defendant TPS ignored its obligation to protect J.I.'s welfare by failing to promptly notify Ms. Isom, his legal guardian, of the attack.  Instead, Defendant TPS tried to quell a developing media firestorm.

38.    On February 9, the same day as J.I.'s assault, Defendant TPS issued a press statement with local news: "Today an incident took place at Tisdale Elementary School.  TPS Campus Police and Tulsa Police Department responded immediately.  There is nothing we take more seriously than the safety and wellbeing of our students, and additional counselors will be at the school on Monday to support the school community.  As this is an ongoing investigation, we have no other comment at this time."[2]

39.    But TPS's statement was false.  While representing to the public that the "safety and wellbeing" of TPS students was its first priority, TPS was endangering the safety and wellbeing of J.I.

40.    Further, pursuant to TPS Policy 2110-R, "every person having reason to believe that a child under the age of eighteen (18) years is a victim of abuse or neglect [is required] to promptly report to the Department of Human Services (DHS)."[3]  Pursuant to Oklahoma Administrative Code § 210:15-13-9(e), incorporated by reference in TPS Policy 2118, incidents of restraint against "a student with disabilities shall be reported immediately to a school site administrator and documented using the statewide online IEP reporting system."[4]  Upon

---

[2] John Hayes, *TPS employee arrested for allegedly abusing special needs student*, News Channel 8 (Feb. 9, 2024), ktul.com/news/local/tps-employee- arrested-for-allegedly-abusing-special-needs-student.
[3] *Tulsa Pub. Schs. Policy 2110-R: Reports of Child Abuse/Neglect*, Tulsa Pub. Schs., tulsaschools.org /about/board-of-education/policysearch/viewpolicy/~board/policies/post/policy- 2110-r-reports-of-child-abuseneglect (last revised Nov. 2013).
[4] *Tulsa Pub. Schs. Policy 2118: Physical Restraint of Students with Disabilities*, Tulsa Pub. Schs. (Feb. 2011), tulsaschools.org/about/board-of-education/policysearch/viewpolicy/~board/policies/ post/policy-2118-physical-restraint-of-students-with-disabilities.

information and belief, in violation of the mandated actions under each of these policies, Wayman Tisdale failed to report Stowell's abusive use of restraint against J.I. to DHS and did not document the incident in the statewide online IEP reporting system.

41.    After the attack, TPS staff kept J.I. at school.  That same day, Ms. Isom received a call from the Wayman Tisdale's Principal (the "Principal").  The Principal vaguely informed Ms. Isom that J.I. had been involved in a situation at school with an employee, and that J.I was with an on-site therapist.  She did not tell Ms. Isom that J.I. had been assaulted, or that the school employee had been arrested for criminal abuse of J.I.  While on the phone, the Principal assured Ms. Isom that everything was fine, J.I. was doing well, and Ms. Isom had nothing to worry about.

42.    Although J.I. was taken to the on-site school therapist that day, the therapist was never informed about the assault.  Upon information and belief, the therapist was kept in the dark about what had transpired on the playground, and she was led to believe J.I. was visiting her so he could calm down after a tantrum.  Defendant TPS placed J.I. at unnecessary risk of further harm by failing to provide the therapist with relevant information in order for her to adequately assess J.I.'s mental and emotional condition and provide him with critical support in the aftermath of Defendant Stowell's assault.

43.    When J.I. finally went home at the end of the day, he said nothing to Ms. Isom about the assault.  J.I. feared he would get in trouble for speaking up about being harmed because no one at TPS did anything to demonstrate to him that Stowell's actions were wrong.

44.    On Monday, February 12, 2024, Ms. Isom was finally informed by a TPS employee that Defendant Stowell had assaulted J.I. on Friday, February 9, 2024.  She also learned that Defendant Stowell was arrested for child abuse for his conduct, and that the assault was captured on video.

45.    After learning this information, Ms. Isom asked J.I. to tell her what happened.  J.I.

told Ms. Isom that a man threw him on the ground, and that his leg had hurt following the attack. J.I. told Ms. Isom that he had not told her what had happened because he was scared that he would get in trouble.

46.     Terrified that J.I. had suffered physical injury and trauma, Ms. Isom took J.I. to a local hospital for evaluation that same day.  Defendant TPS's failure to alert Ms. Isom to the details of the assault, and potential injury to J.I., for three days after it occurred affected J.I.'s ability to receive prompt medical and psychological care and risked him exacerbating current injuries or sustaining new ones during that delay.

47.     Apart from the call on Monday, February 12, Wayman Tisdale did not otherwise inform Ms. Isom about the assault.  TPS told the press that it would offer counseling services to students who had witnessed the assault, an acknowledgment of the traumatic effects witnessing such an attack could have on children.  But TPS and the School never met with J.I. to discuss the incident.  They did not collaborate with Ms. Isom on accommodations for J.I stemming from his experience of this criminal abuse or offer any services that would be reasonably necessary for J.I. to return to the School following the traumatic assault.

### C.     J.I Experienced Severe Harm and Educational and Developmental Regression as a Result of Stowell's Assault and TPS's Failure to Respond.

48.     J.I. experienced clear and immediate regression of his condition as a direct result of Defendant Stowell's assault.

49.     Prior to living with Ms. Isom, J.I. experienced abuse.

50.     In 2023, when J.I. began living with Ms. Isom, J.I. would hide food, suggesting that he was not adequately fed in his prior home.  Additionally, J.I. reported to Ms. Isom that on at least one occasion someone in his prior home  deliberately knocked over a bowl of pet food and forced J.I. to kneel on the floor and clean it up.  As J.I. struggles with communication due to his

disabilities, there are likely other episodes of abuse and mistreatment that he has not yet shared with Ms. Isom and others.

51.    J.I. has been diagnosed with autism, ADHD, anxiety, and PTSD.  J.I.'s Disabilities have various manifestations, some of which are physical, and are compounded by his past traumas. Researchers have acknowledged a "bi-directional" relationship between PTSD and ADHD, which indicates that J.I.'s childhood trauma both contributes to the severity of his ADHD symptoms and is, in turn, intensified by his ADHD.[5]

52.    J.I. had to receive crisis care at an outpatient facility twice in the three weeks following the assault.  Stowell's attack not only traumatized J.I., but *re*-traumatized him, compounding traumatic experiences he had endured earlier in life.  It was a trigger event that exacerbated his PTSD and emotional and psychological vulnerabilities.  In one fell swoop, the assault undid the social, emotional, and behavioral progress that J.I. had achieved in therapy and through the stable, loving care Ms. Isom had provided over the preceding months.

53.    TPS's failure to inform Ms. Isom of the full details of the assault until three days after it occurred exacerbated the harm J.I. experienced and delayed him receiving critical medical and psychological care.

**1.    Stowell's Assault Traumatized J.I. So Severely That He Was Forced to Leave School, Causing Him Irreparable Academic Learning Loss and Missed Developmental Opportunities.**

54.    After Ms. Isom learned the full details of Defendant Stowell's assault on J.I., she was so horrified that she kept him home from school.  Nevertheless, without other immediately available schooling options, Ms. Isom was forced to send J.I. back to Wayman Tisdale.

---

[5] Shaili Jain, *4 Lesser-Known Facts About the Link Between ADHD and PTSD*, Psychology Today (Oct. 22, 2024), psychologytoday.com/us/blog/the-aftermath-of-trauma /202410/4-lesser-known-facts-about-the-link-between-adhd-and-ptsd.

55.    Despite its statements to the press regarding additional counseling for students and supporting the School community, Wayman Tisdale failed to make any real efforts to address J.I.'s increased needs following Defendant Stowell's violent attack.  Defendant TPS and Wayman Tisdale were on notice of J.I.'s vulnerability and special needs given his Disabilities, but did not update J.I.'s already-deficient IEP or provide him with a Behavior Intervention Support Plan ("BISP") in the immediate aftermath of the assault, both of which should have been in place to protect J.I. and to ensure his needs were being met.

56.    It quickly became clear to Ms. Isom that J.I. could not stay at Wayman Tisdale after the attack.  He was unable to learn, and the symptoms of his disabilities had increased.  Ms. Isom un-enrolled J.I. from Wayman Tisdale and enrolled him in online classes, which he attended from home for the remainder of the 2023-2024 academic year.  In order for J.I. to learn at home, Ms. Isom had to frequently take time off work and pay additional expenses that she would not have incurred had J.I. been enrolled in a public school.  J.I. continued online schooling for the entire 2024-2025 academic year.  Ms. Isom felt that she had no other choice but to enroll J.I. in online school as he was having increased difficulty managing his emotions and engaging with others—a trauma response to Defendant Stowell's attack.

57.    Attending school online was the only viable option for J.I. at the time, but it was a poor substitute for in-person learning, particularly given J.I.'s behavioral and development needs. J.I. spent one academic year, at a time critical to his development, without peer interaction and access to the specialized education he needed.

### 2.    TPS Denied J.I. Access to Education by Attempting to Prevent Him from Re-Enrolling and Later Pushing Him Out of School in Violation of His Civil Rights.

58.    Eventually, Ms. Isom could no longer sustain educating J.I. online, and she re-enrolled him at Wayman Tisdale for the 2025-2026 academic year.

59.    Although Ms. Isom was reluctant to send J.I. back to the school that had abused and traumatized him, she was unable to continue supervising J.I.'s online schooling while balancing her job and other responsibilities.

60.    She knew that J.I.'s Disabilities and related behavioral challenges would make it difficult for him to transfer schools.    Further, Wayman Tisdale had suspended J.I. a disproportionate number of times for behaviors that were manifestations of his Disabilities, and the suspensions would have made the school transfer process even more difficult.

61.    TPS admitted that J.I.'s behavioral challenges—for which he had been suspended—were disability-related manifestations during a manifestation meeting at Wayman Tisdale with J.I.'s IEP team on December 18, 2025.  A manifestation meeting is required under federal law when schools enact significant disciplinary procedures against students with disabilities in order to determine if the behavior for which the student is disciplined was caused by their disability or the school's failure to properly provide adequate special education services.

62.    Despite TPS's utter failure to adequately accommodate J.I. as a student with disabilities, Ms. Isom had no other option at the time but to place J.I. back at Wayman Tisdale. But it was immediately apparent that Wayman Tisdale had already given up on J.I.

63.    TPS officials deliberately obstructed J.I.'s return to school.  While Ms. Isom was able to re-enroll her other two grandchildren at Wayman Tisdale a month before the 2025-2026 school year began without issue, she was unable to enroll J.I. until a full week after the school year started, despite providing the necessary information.

64.    A School administrator ("School Administrator") told Ms. Isom that they did not want J.I. to return due to his behavioral challenges, even though they knew or should have known that those challenges were manifestations of J.I.'s Disabilities.  This was discriminatory and illegal.

65.    J.I.'s reenrollment was further impeded when, upon information and belief, an

14

unknown individual accessed the Wayman Tisdale enrollment system and entered an incorrect address for J.I. that placed him outside of the School's purview. It is unlikely that this was a mere system glitch or clerical error because this change was not made for Ms. Isom's other two grandchildren living at her address, who were permitted to enroll.

66. When Ms. Isom contacted the TPS Board of Education ("TPS Board") for assistance, a Board member then spoke to the School Administrator to specifically instruct them to enroll J.I. at Wayman Tisdale.

67. The School Administrator's comments to Ms. Isom and their refusal to enroll J.I. at Wayman Tisdale without the TPS Board's intervention indicated that they continued to see J.I. as a "problem child" and would not ensure that his needs would be met as a student with disabilities, in direct violation of the School Administrator's legal obligations as a public school official. This series of events exemplifies TPS's systemic failure to appropriately accommodate disabled students.

68. Wayman Tisdale continued to mistreat J.I. after his re-enrollment. By October 2025, J.I. had already been suspended roughly four times for behaviors that are manifestations of his Disabilities, as noted by his IEP. Again, despite indications that the accommodations it provided to J.I. were insufficient, TPS did not take steps necessary to address J.I.'s needs, opting instead to punish him and remove him from school.

69. Defendant TPS actively blocked J.I.'s access to education through further mistreatment. For example, on December 17, 2025, J.I., emotionally triggered by a teacher yelling at him during lunch, ran out of the building to the School's playground. The School called Ms. Isom to come pick J.I. up. When Ms. Isom arrived, she found J.I. outside, and she learned that the School refused to allow J.I. back inside the building, denying him access to education yet again. J.I. was so distressed that he ran away and hopped over a fence, entering a neighborhood next to

the School.  TPS Police were called to assist Ms. Isom in finding J.I., who had been again traumatized at the hands of TPS.

70.     J.I. was then taken to an inpatient psychiatric facility for treatment.  J.I. would have been admitted again except the facility refused to check J.I. in because his behavioral disability manifestations occurred only at school.

71.     At a manifestation meeting on December 18, 2025, Wayman Tisdale stated that it could not provide J.I. with the services he needed to meaningfully access its public facilities and transferred him to a new TPS school as of January 13, 2026.  After years of trivializing Stowell's assault against J.I., refusing to adequately accommodate J.I.'s Disabilities, and denying J.I. access to education in violation of his civil rights, the School finally admitted that it was failing J.I., and pushed him out of Wayman Tisdale.

**D.     J.I.'s History as a Student with Disabilities Required Special Accommodation.**

**1.     Teaching Staff at Wayman Tisdale Were Made Aware of J.I.'s Disabilities, Their Manifestations, and the Trauma in His Past.**

72.     The video footage does not show Stowell and J.I.'s interaction immediately before the attack.  But it is clear that regardless of what transpired between them, Stowell's response violated J.I.'s IEP and his rights.

73.     J.I. entered the foster care system when he was two years old.  He was adopted by his grandmother, Ms. Isom, on July 25, 2024.  J.I.'s biological mother passed away in September 2025.

74.     Before J.I. was enrolled at Wayman Tisdale, he was a student at Tulsa Legacy Charter School ("Tulsa Legacy").  Pursuant to 20 U.S.C.A. § 1414(d), Tulsa Legacy developed an IEP for J.I. to accommodate his Disabilities, to be in place from April 10, 2023 to April 9, 2024 (the "April 2023 IEP").

75.     The April 2023 IEP does not list J.I.'s specific Disabilities, but it notes that J.I.'s "Primary Disability" is "Developmentally Delayed," and that his "Secondary Disability" is "Speech or Language Impairment."   The April 2023 IEP also makes clear that J.I.'s "developmental delay" manifests in J.I. "throwing tantrums in the classroom, screaming out in class, trying to hit people (with success), and throwing things."

76.     The April 2023 IEP further clearly and unambiguously states J.I. has "challenges in the general education setting that would often lead to episodes in which he needed time and a calming space to de-escalate," and that J.I. "struggles with regulating his emotional responses." The April 2023 IEP notes that J.I. "seems to be triggered very easily, and at times without any obvious or apparent determining factor."

77.      Further, immediately before J.I. was enrolled at Wayman Tisdale, he was admitted to a partial hospitalization behavioral health treatment program following a mental health incident. The program brings in teachers from Defendant TPS to provide education to participants.

78.     Following his participation in this treatment program, the then-seven-year-old J.I. transferred to Wayman Tisdale partway through the academic year.   The April 2023 IEP transferred with him.  In addition to being on notice that J.I. required accommodations for his Disabilities pursuant to the April 2023 IEP, Wayman Tisdale was aware that J.I. was transferring from a behavioral health treatment program—a clear indication that J.I. would need to receive meaningful accommodations to ensure his right to access the education that Defendant TPS was required to give him.

79.     Further, Defendant TPS was aware that J.I. was in foster care at the time of his enrollment in December 2023.  J.I. was living with Ms. Isom, although she had not yet officially adopted him.

80.     Despite being on notice, Wayman Tisdale failed to pay proper care to J.I.'s IEP and

the training that Defendant TPS's employees needed to understand how best to support J.I. Instead, Defendant TPS disregarded J.I.'s IEP, paving the way for the physical abuse he ultimately suffered in TPS's care.

81.     Every fact at Defendant TPS's disposal indicated that J.I. was a student who would require, as is his right, accommodations for his Disabilities. Defendant TPS received the April 2023 IEP. Defendant TPS was aware J.I. was recently in a partial hospitalization behavioral health treatment program. And yet, Defendant TPS neglected to properly inform and train school personnel, ultimately subjecting a seven-year-old J.I. to yet another instance of abuse in his young life.

### 2.     Defendant TPS Failed to Update the Facially Inadequate April 2023 IEP.

82.      Defendant TPS failed to live up to its legal obligations to J.I.—and this failure started immediately when J.I. enrolled.

83.     Upon information and belief, J.I.'s partial hospitalization treatment program shared J.I.'s academic record with Defendant TPS upon J.I.'s enrollment at Wayman Tisdale. Nonetheless, Defendant TPS did not immediately seek to reassess J.I. or otherwise update the April 2023 IEP when J.I. started at Wayman Tisdale in December 2023.

84.     TPS made this decision in spite of the fact that the April 2023 IEP was facially inadequate to meet J.I.'s evolving needs.

85.     The April 2023 IEP was not accompanied by a BISP. Upon information and belief, no Functional Behavioral Assessment ("FBA") was performed in conjunction with the April 2023 IEP.

86.     Upon information and belief, Defendant TPS did not inquire what led to J.I.'s admission to the behavioral health treatment program and whether those circumstances would warrant an FBA and BISP, or even whether the April 2023 IEP may need to be updated as a result.

18

87.    Further, Defendant TPS did not otherwise question why an FBA was not conducted or a BISP created by Tulsa Legacy, nor did Defendant TPS suggest implementing either. Defendant TPS was on notice that the disabilities, manifestations, and accommodations outlined in the April 2023 IEP warranted an FBA and likely a subsequent BISP to ensure that J.I. was receiving the behavioral support and accommodations that he needed.

88.    Instead, Defendant TPS ignored J.I.'s treatment program, an apparently critical development in J.I.'s need for accommodations since the April 2023 IEP's enactment and kept the April 2023 IEP in place unchanged.

89.    As far as program modifications, the April 2023 IEP notes that J.I. "will be receiving monitoring services to address any potential negative behaviors that may arise" and that J.I. "may need additional individual assistance and attention in settings where he has become escalated to such an extent that removal from environment is necessary.  During such times, [J.I.] will not participate in activities with his nondisabled peers."  The April 2023 IEP provides certain behavioral supports as part of a Contingency Plan should J.I.'s behavior require intervention.  The behavioral supports explicitly state that "[p]ositive reinforcement strategies" should be used and that "[n]egative reinforcement is ineffective and should be avoided.  *Consequences should be logical and reasonable rather than punitive*."  (emphasis added).

90.    The April 2023 IEP does not otherwise provide a framework for engaging with J.I. when he is in an escalated state.  The behavioral supports listed in the April 2023 IEP are vague and provide few concrete details on how to de-escalate a manifestation of J.I.'s Disabilities.  The April 2023 IEP does not elaborate on what "individual assistance and attention" would be most helpful to J.I. when he is experiencing a manifestation of his Disabilities.  It does not endeavor to identify any patterns in J.I.'s triggers, writing his manifestations off as occurring "without any obvious or apparent determining factor."  Yet again, Defendant TPS should have easily identified

19

that the April 2023 IEP was insufficient and would not successfully accommodate J.I.'s needs. While this language may be standard in IEPs, Defendant TPS was aware that its teachers and staff had not developed the April 2023 IEP or worked with J.I. before.  More detailed information on how to properly engage with J.I. when he is experiencing a manifestation of his Disabilities could have been the difference between adequately accommodating J.I. and not.

91.    The necessity to conduct an FBA and implement a BISP should have been immediately apparent upon J.I.'s transfer.  Even if Defendant TPS wanted to provide time for J.I. to acclimate to Wayman Tisdale before developing adjustments to the April 2023 IEP, Defendant TPS had two months between J.I.'s start at Wayman Tisdale and Defendant Stowell's attack to meet J.I.'s needs.  It failed to do so.

92.    Those two months were enough to know that the April 2023 IEP was ineffective. Between J.I.'s enrollment at Wayman Tisdale and Defendant Stowell's assault, Ms. Isom was called to the School repeatedly to pick J.I. up after incidents following from manifestations of J.I.'s Disabilities.  Still, Defendant TPS took no action to address the deficient IEP or provide an FBA or BISP, which J.I. obviously needed.

93.    Defendant TPS's failure to meet its mandate to accommodate J.I. in December 2023 is made more obvious considering that in September 2025 Defendant TPS provided J.I. with a revised IEP (the "September 2025 IEP").  The September 2025 IEP lists the same manifestations of J.I.'s Disabilities as the April 2023 IEP: "throwing tantrums in the classroom, screaming out in class, trying to hit people (with success), and throwing things."

94.    While the manifestations of J.I.'s Disabilities did not change between the IEPs, Defendant TPS's proposed accommodations for J.I. did.  The September 2025 IEP lists more concrete behavioral supports as part of his Contingency Plan than the April 2023 IEP.  The September 2025 IEP requires that that J.I. be given space to de-escalate and that staff-members

"wait and allow for processing time [and] give space and time to self-regulate if possible," rather than the nebulous guidance in the April 2023 IEP that J.I. should be met with "[p]ositive reinforcement strategies."

95.    In addition to the September 2025 IEP providing for more specific and actionable behavioral supports than the April 2023 IEP, in September 2025 Defendant TPS provided J.I. with a Behavior Intervention and Support Plan (the "September 2025 BISP").  The September 2025 BISP, if it had been in place in February 2024, would have established a framework to respond to J.I.'s behavioral challenges and would have prevented Defendant Stowell's assault.

96.    The September 2025 BISP notes that the FBA provided to J.I. shows that when given a task or demand or denied access to his preferred items or activities, J.I. may engage in tantrums, aggression, or elopement.  These responses align with the manifestations identified in J.I.'s April 2023 IEP.  The September 2025 BISP outlines strategies to prevent, address, and redirect this behavior.  Critically, the September 2025 BISP requires that J.I. be given "space and time to self-regulate or deescalate before intervening if possible."  The September 2025 BISP provides that J.I. "should be given the opportunity to access an alternate space to calm down" and teachers and staff should "remain calm and neutral" when J.I. is having a reaction.  If physical intervention is necessary to prevent harm teachers and staff must "use the least restrictive methods following approved protocols and training (Mandt.)."

97.    The September 2025 IEP and September 2025 BISP confirm that Defendant TPS had the ability to revise and improve upon J.I.'s April 2023 IEP in December 2023 but chose not to take these necessary actions.

98.    By its terms, and Defendant TPS's failure to adequately update it, the April 2023 IEP remained in place through the time of Defendant Stowell's attack on J.I. in February 2024.

99.    Even though the April 2023 IEP was not adequate or updated, Defendant Stowell's

criminal assault on J.I. was in clear violation of the April 2023 IEP.  Defendant TPS's inability to ensure staff compliance with the April 2023 IEP highlights a continuing failure to provide required accommodations for J.I. in violation of his rights.

### 3.    Defendant Stowell's Abuse Violated J.I.'s IEP.

100.    Defendant Stowell's actions were clearly abusive, punitive, and in direct contravention of the April 2023 IEP.  Further, the April 2023 IEP notes that manifestations of J.I.'s Disabilities can be minimized through "a calm demeanor from teachers."  Even if the video footage had shown a conflict between J.I. and Stowell or between J.I. and another student prior to the assault (it does not), Stowell violated the IEP by dragging, slamming, and violently restraining J.I. instead of de-escalating the situation.

101.    The absence of any language in the April 2023 IEP authorizing Stowell's assault—or any actions close to it—precludes any educational or behavioral justifications for Stowell's conduct.  There can be no pretense that such a gruesome display of force was necessary to instruct or engage with J.I.

102.    Defendant Stowell's criminal assault on J.I. was in clear violation of the April 2023 IEP.  Defendant TPS's failure to ensure that its staff followed J.I.'s current IEP reflected its ongoing failure to accommodate J.I.

### E.    Defendant TPS Failed to Implement Adequate Policy Changes and Training Protocols to Protect Its Students with Disabilities.

103.    TPS's failure to prevent and remediate Stowell's attack on J.I. is indicative of TPS's systemic failure to meet the needs of its disabled students.

104.    Defendant TPS was aware of its need to make changes to adequately provide for its students with disabilities many years before the abuse by Defendant Stowell.  And still, it failed to remediate.  This failure to reform the district's inadequate policies paved the way for abuse of

vulnerable students with disabilities, including for Defendant Stowell's violent and traumatic attack on J.I.

> **1.    Defendant TPS Knew That Changes to Its Policies Were Needed but Failed to Make Appropriate Amendments.**

105.    Defendant TPS was on notice, for years, that its policies have failed to protect students with disabilities, and yet TPS has made no apparent change.  Since 2017, TPS publicly settled at least four lawsuits alleging the use of force or an assault by a school employee against a student.[6]  At least two of these lawsuits allege that school administrators seized the students by dragging them or restricting their ability to breathe.[7]  TPS is currently litigating a lawsuit alleging that a teacher choked and injured a four-year-old student while forcefully waking him up from a nap.[8]

106.    Defendant Stowell's actions are indicative of a disturbing pattern at TPS. Defendant TPS has neglected to make significant changes to prevent abuse against the students it

---

[6] Notice of Settlement, *Danielle Poole and Shawn Cain, individually, and on behalf of S.D.C., as his next friends v. Indep. Sch. Dist. No. 1 of Tulsa Cnty., Okla., Carl A. Pendelton*, No. CJ-2023-1523 (Tulsa Cnty. Dist. Ct. July 18, 2025); Order Granting Joint Appl. To Settle Claims of a Minor and Approving Settlement Agreement with Minor, *Lynette Parker, as parent and next friend of Z.T., a minor child v. Indep. Sch. Dist. No. 1 of Tulsa Cnty. d/b/a Tulsa Pub. Schs.*, No. CJ-2023-784 (Tulsa Cnty. Dist. Ct. Dec. 23, 2024); Order Granting Joint Appl. To Settle Claims of a Minor and Approving Settlement Agreement with Minor, *Mora Martina, as closest friend of, J.L., JR (minor child) v. State of Okla.; City of Tulsa, Tulsa Pub. Schs. East Cent. Junior High Sch.; Tulsa Pub. Schs. Bd. Of Educ.; and John Blackwell, individually and in his off. capacity as teacher,* No. CJ-2019-2138 (Tulsa Cnty. Dist. Ct. Aug. 12, 2020); Order Approving Settlement Agreement with Minor, *Constance Campbell, Individually and as Mother and Next Friend of S.L.B., a minor v. Summer Bass, Individually, and Tulsa Pub. Schs., a/k/a Indep. Sch. Dist. No. 1 of Tulsa Cnty.,* No. CJ-2014-3311 (Tulsa Cnty. Dist. Ct. Jan. 18, 2017)
[7] Pet. ¶ 12, *Lynette Parker, as parent and next friend of Z.T., a minor child v. Indep. Sch. Dist. No. 1 of Tulsa Cnty. d/b/a Tulsa Pub. Schs.*, No. CJ-2023-784 (Tulsa Cnty. Dist. Ct. filed Mar. 7, 2023); Pet. ¶¶ 14-15, *Mora Martina, as closest friend of, J.L., JR (minor child) v. State of Okla.; City of Tulsa, Tulsa Pub. Schs. East Cent. Junior High Sch.; Tulsa Pub. Schs. Bd. Of Educ.; and John Blackwell, individually and in his off. capacity as teacher,* No. CJ-2019-2138 (Tulsa Cnty. Dist. Ct. filed May 24, 2019).
[8] Pet. ¶ 7, *Yashica Morton, individually and as mother and next friend of K.M., a minor v. Indep. Sch. Dist. No. 1 of Tulsa Cnty.,Okla., Sally Potter*, No. CJ-2024-3528 (Tulsa Cnty. Dist. Ct. filed Sept. 20, 2024).

claims to protect.  Assault by school employees is a systemic problem that TPS has failed to adequately address.

107.    Defendant TPS's alleged commitment to "fostering safe, supportive, joyful learning environments" is nothing more than hollow language, as evidenced by repeated instances of gruesome abuse that have occurred on TPS's watch.[9]

**2.    In Recent Years, TPS Has Failed to Meet Required Benchmarks Necessary to Support Its Students with Disabilities.**

108.    During the past five-plus years, Defendant TPS has failed to make the required and essential improvement to maintain several special education standards.  Although "the district has failed to meet required benchmarks for several previous school years," it has only recently initiated corrective measures.[10]

109.    Defendant TPS's stated vision for special education services includes "equitable access to inclusive environments that provide high-quality educational opportunities" for all students, and "that each student be given the individualized support and resources needed to develop, achieve, and thrive as they create a pathway to long term success in school and life."[11]

110.    Despite these claims, in 2024, Defendant TPS was downgraded from a level 3 rating (needs intervention) to a level 4 rating (in need of substantial intervention) by the Oklahoma State Department of Education, after missing key state and federal benchmarks in its administration of special education services.[12]

111.    As of May 2025, TPS had been "out of compliance with special education

---

[9] *Student and Family Guide to Success*, Tulsa Pub. Schs., tulsaschools.org/student-and-family-support/student-and-family-support-services/behavior-guide/~board/student-and-family-guide- to-success/post/behavior-response-plan-overview (last visited Feb. 6, 2026).
[10] Scot, *supra* note 1.
[11] *Special Education Services*, Tulsa Pub. Schs., tulsaschools.org/about/teams/exceptional- student-services (last visited Feb 6, 2026).
[12] Scot, *supra* note 1; Special Educ. Servs., Okla. State Dep't of Educ., *supra* note 1, at 16.

standards" for more than *five years*.[13]

112.    On May 22, 2025, TPS Board Vice President Calvin Moniz also acknowledged a pattern of racial and ethnic bias and mistreatment within TPS.  Per Vice President Moniz, TPS is "under formal review for significant racial and ethnic disparities in long-term suspensions and expulsions of students with IEPs."[14]  The most recent data collected by the U.S. Department of Education for the 2020-2021 academic year shows that Black students bear the brunt of these disparities—Black K-12 disabled students represented 46.2% of disabled students given one or more out-of-school suspensions, despite making up only 27.9% of the total disabled student population.[15]

113.    Defendant TPS not only failed to meet the requirements to adequately protect its disabled students, but for more than five years failed to make meaningful change and improve its special education services.

114.    The TPS Board publicly acknowledged its shortcomings in special education during a May 21, 2025 TPS Board Meeting.  The Board made plans to prepare a corrective action plan, which outlines steps such as: "[t]rain campus teams on new procedures," "[b]uild a support framework for campuses and staff," and "[r]edesign the leadership team and support structure."[16]

115.    Such reforms could have prevented Defendant Stowell's abuse of J.I. Unfortunately, these actions are too little, too late for J.I., a child with disabilities who will have to carry the trauma of Defendant Stowell's assault with him for the rest of his life.

116.    If Defendant TPS had made the necessary changes to address its egregious special

---

[13] Scot, *supra* note 1.
[14] *Id.*
[15] *Civil Rights Data Collection, Tulsa*, U.S. Dep't of Educ., Off. for C.R., ocrdata.ed.gov/profile/us/ok/tulsa?survey Year=2020&nces=4030240 (last visited Feb. 7, 2026)
[16] Scot, *supra* note 1.

education shortcomings, J.I.'s violent attack at the hands of Defendant Stowell could have been avoided.

### 3.    The Reported Numbers on Corporal Punishment Are Likely Underreported and Undercounted.

117.    Defendant TPS further fails its disabled students through a culture that normalizes the systemic use of excessive physical force against students, regardless of TPS's stated policies. TPS's normalization of the use of excessive physical force led to Stowell's attack on J.I.

118.    Despite a 2020 amendment to Oklahoma administrative rules explicitly prohibiting the use of corporal punishment against students entitled to special education services, Okla. Admin. Code § 210:15-13-9 (2020), Oklahoma schools reported a total of 276 instances of corporal punishment against K-12 disabled students for the 2020-2021 school year.[17]  A total of 1,579 K-12 students were subjected to corporal punishment in Oklahoma during the 2020-2021 school year.[18]

119.    These numbers are likely an undercount.  Oklahoma does not currently require school districts to report instances of corporal punishment.[19]  This lack of mandatory reporting allows TPS to operate without meaningful accountability or independent review, putting students at risk and enabling abuse or misconduct by District employees and those responsible for student care.  Without accurate information and proper oversight, such misconduct is normalized, overlooked, and ultimately unaddressed.

120.    Only seven districts reported their numbers to the state during the 2022-2023

---

[17] *See Civil Rights Data Collection: State Summary, Oklahoma*, U.S. Dep't of Educ., Off. for C.R., ocrdata.ed.gov/profile/ us/OK?surveyYear=2020 (last visited Feb. 6, 2026).
[18] *Id.*
[19] Sierra Pfeifer, *Oklahoma schools don't report corporal punishment use. A new bill could change that*, KOSU (Jan. 9, 2025), kosu.org/education/2025-01-09/oklahoma-schools-dont-report-corporal-punishment-use-a-new-bill-could-change-that.

academic year.[20]  During the 2023-2024 academic year, only one district reported its numbers to the state.[21]

121.    One of the districts that appears to obscure its corporal punishment data is TPS. For example, the United States Department of Education does not have any data on the use of corporal punishment for TPS or Wayman Tisdale from 2020-2021.[22]  While data was reported but reflected a value of "0" for the K-12 Student Discipline "Expulsion with Educational Services – Students with Disabilities" category, both the K-12 Student Discipline "Corporal Punishment – Students with Disabilities" and "Corporal Punishment – Students without Disabilities," categories list "Data not available."[23]

122.    As a Black student, statistics show that J.I. is at a higher risk of being subjected to corporal punishment—that is to say, physical abuse—at the hands of school administrators.  In the 2020-2021 academic year, non-disabled Black students made up 7.9% of Oklahoma's non-disabled student population, but accounted for 9.2% of corporal punishment instances among non-disabled K-12 students, despite the fact that corporal punishment is prohibited in the majority of urban and suburban districts where Oklahoma's Black students predominantly live.[24]  K-12 disabled boys in Oklahoma accounted for more than six times the use of corporal punishment than

---

[20] *Id.*

[21] *Id.*

[22] U.S. Dep't of Educ., Off. for C.R., *Tulsa*, *supra* note 15; *Civil Rights Data Collection, Wayman Tisdale Fine Arts Acad.*, U.S. Dep't of Educ., Off. for C.R., ocrdata.ed.gov/profile/us/ok/tulsa/wayman_tisdale_fine_arts_acad?surveyYear=2020&nces=403024001599 (last visited Feb. 6, 2026).

[23] U.S. Dep't of Educ., Off. for C.R., *Tulsa*, *supra* note 15; U.S. Dep't of Educ., Off. for C.R., *Wayman Tisdale Fine Arts Acad.*, *supra* note 22.

[24] *See* U.S. Dep't of Educ., Off. for C.R., *State Summary: Oklahoma*, *supra* note 17; David Blatt, Colleen McCarty, Leslie Briggs, et al., *"We Don't Hit" Ending Corporal Punishment in Oklahoma Schools*, Okla. Appleseed Ctr. for Law & Justice 26 (Oct. 2023) static1.squarespace.com/static/652e903181660a0345fd4660/t/65494bbf612a7948d5ff9e82/1699302338720/WE+DON%27T+HIT+-+ENDING+CORPORPAL+PUNISHMENT+IN+.

disabled girls and non-disabled boys accounted for almost five times the use as non-disabled girls.[25]  In the 2021-2022 school year, the first academic year where corporal punishment against disabled students was banned, disabled students still made up 21.2% of K-12 students subjected to corporal punishment, despite comprising only 18% of total Oklahoma students.[26]

123.    A consistent practice of underreporting uses of force against students and disproportionate rates of force against Black and disabled students created an environment where Stowell was emboldened to commit criminal abuse of J.I.  Stowell's criminal abuse of J.I. is a direct and foreseeable result of this systemic abuse.  The lack of reporting data shielded Defendant TPS from accountability and failed to protect vulnerable students like J.I.

124.    Research also indicates that students like J.I., with disabilities that impact their ability to emotionally regulate or conform with conventionally appropriate behavior, are more likely to be subjected to corporal punishment, on account of how their disabilities manifest.[27]  Not only was J.I. at a heightened risk for abuse, but Defendant TPS failed to take meaningful action to protect him, and students like him.

**4.    Abuse in TPS was Mislabeled as "Restraint," Which Enabled Abuse.**

125.    Although corporal punishment has been prohibited against all students in the Tulsa Public School District since 1991, the culture that allowed it for so long remains.[28]  When hitting children to secure their compliance is generally seen as acceptable, and even desirable, the baseline tolerance for the use of physical force against students is higher, even in districts that have restricted certain forms of that conduct.

---

[25] *See* U.S. Dep't of Educ., Off. for C.R., *State Summary: Oklahoma*, *supra* note 17.
[26] *See id*.
[27] *Impairing Education Corporal Punishment of Students with Disabilities in US Public Schools*, Human Rights Watch, ACLU 37-40 (Aug. 2009) assets.aclu.org/live/uploads/publications /impairingeducation.
[28] Blatt, McCarty, Briggs, et al., *supra* note 24, at 14.

126.    For example, TPS Policy 2112, which prohibits the use of corporal punishment still provides that "[e]mployees may use reasonable and necessary physical force to protect persons or property."[29]  Without clear parameters around how employees should interpret "reasonable" and "necessary" action, the policy leaves staff underprepared and enables abuse of students.

**5.    TPS Policies Leave School Employees Underprepared and Facilitate Physical Abuse.**

127.    TPS policies fail to provide sufficient guidelines to teachers about interacting with students with disabilities.  Without specific guidelines and appropriate training, school personnel are underprepared to navigate interactions with students with disabilities.

128.    Although TPS permits staff to use "reasonable" "physical force to protect persons or property," policies do not define "reasonable" force or provide guidelines for when it is "necessary" to "protect persons or property."[30]  The vagueness of this language puts students at risk.

129.    TPS Policy 2118 seeks to "define the circumstances under which District personnel may use physical restraint for students with disabilities in compliance with SDE Guidelines for Minimizing the Use of Physical Restraint for Students with Disabilities in Oklahoma ("Physical Restraint Guidelines")."[31]  Policy 2118 defines "physical restraint" as "any method of one or more persons limiting or restricting another person's freedom of movement, physical activity, or normal access to that person's body.  It is a means for managing that person's movement, *reconstituting behavioral management* and establishing and maintaining safety of the student, other students and

---

[29] *Tulsa Pub. Sch. Policy 2112: Corporal Punishment*, Tulsa Pub. Schs., tulsaschools.org/about/board-of-education/policysearch/viewpolicy/~board/ policies/post/policy-2112-corporal-punishment (last revised Dec. 2013).
[30] *Id.*
[31] *Tulsa Pub. Schs., supra* note 4.

staff." [32]

130.    The Physical Restraint Guidelines (Okla. Admin. Code § 210:15-13-9) fail to define both when a student's actions would "pose an imminent danger of serious physical harm to the student or other individual," and when "less restrictive measures appropriate to the behavior exhibited by the student" should turn into an escalated restrictive response.  There is real-life consequence to this uncertain language.  Specifically, this lack of clarity grossly underprepared those responsible for J.I.'s health, safety, and welfare, including Defendant Stowell.

131.    But even with these vague guidelines, Stowell's actions went far beyond the bounds of appropriate behavior and directly violated the Physical Restraint Guidelines, which state that, "[u]nder no circumstances may a student be restrained using a … maneuver that places pressure or weight on the chest, sternum, lungs, diaphragm, neck, throat, or back." [33]  Defendant TPS's training failed to prevent such egregious and harmful behavior that would be unacceptable even if the student were not disabled.  Defendant Stowell's criminal abuse of J.I. was a flagrant violation of the Physical Restraint Guidelines, and still occurred either following inadequate training by TPS, or in the absence of any training by TPS at all.

132.    The existing policies, provisions, and training procedures in TPS routinely fail to protect students with disabilities from experiencing physical abuse at the hands of school personnel.  This much is evidenced by the continued disproportionate use of physical restraint against disabled students by Defendant TPS.  Under Policies 2112 and 2118 (incorporating by reference the Physical Restraint Guidelines), the use of restraint against disabled students continues to be both lawful and common.  In the 2020-2021 school year, TPS reported 193 students

---

[32] *Id.* (emphasis added).
[33] Okla. Admin. Code § 210:15-13-9.

with disabilities, as defined by the IDEA, as being physically restrained.[34]  This statistic does not show how many times each of these 193 students were restrained, or under what circumstances. In comparison, only 202 non-disabled students were physically restrained during the same school year.[35]  This means that 48.9% of TPS students that were physically restrained in 2020-2021 were disabled, despite disabled students accounting for only 16.5% of the TPS student population.[36] Black disabled students were disproportionately physically restrained and make up for 84 restraints (43.5% of disabled student restraints, 21.3% of all restraints) despite accounting for 27.9% and 4.6% of the total student population respectively.[37]

133.    As a Black and disabled student in the TPS district, J.I. was not only vulnerable, but he was left unprotected by Defendant TPS's ineffective policies and inadequate training. Beyond the use of physical restraint, disabled students are also disproportionately punished within TPS.  Despite constituting only 16.5% of the total TPS student population in the 2020-2021 school year, disabled students accounted for 33.9% of K-12 students that were given one or more out-of-school suspensions.[38]  Further, while Black students make up just 27.9% of the total disabled student population, they account for 48.2% of TPS's K-12 disabled students who received one or more out-of-school suspensions.[39]

134.    Disabled students at Defendant TPS are also forced to cope with various other forms of mistreatment and demeaning conduct.  For example, Defendant TPS recently settled a case involving the public humiliation of a disabled student by a special education staff member.[40]

---

[34] U.S. Dep't of Educ., Off. for C.R., *Tulsa*, *supra* note 15.
[35] *See id.*
[36] *See id.* Data for the 2020-2021 school year is the most recent publicly available data, but given TPS's lack of reform, these rates of force used against disabled students likely persist.
[37] *See id.*
[38] *See id.*
[39] *See id.*
[40] Compl. at ¶¶12-22, *Ricky Leland, Individually and as gen. guardian of the person and estate of Daniel*

In that case, the plaintiffs alleged that the school's administration was repeatedly made aware of the teacher's inappropriate and abusive conduct, which included repeatedly yelling at the student, intimidating and threatening him during class, and grabbing him by the neck, but refused to intervene—a harrowing indictment of Defendant TPS's inability to address the systemic mistreatment of disabled students in its schools.

### 6.    Defendant TPS's Failure to Adequately Train Staff and Careless Behavior Toward Students' IEPs Allows for Criminal Abuse of Students with Disabilities.

135.    Defendant TPS did not take its responsibility to prepare IEPs and train special education staff seriously.

136.    Further, in March 2019, the Oklahoma State Department of Education Special Education Services ("OSDE-SES") division held that Defendant TPS was noncompliant with 34 C.F.R. § 300.320 (2)(i)(A)(B), a provision of the Individuals with Disabilities in Education Act (the "IDEA") for failure to adequately consider the individualized needs of disabled students when developing their IEPs pursuant to the IDEA.[41]  The OSDE-SES ordered defendant TPS to review the goals identified in each student's IEP to identify the extent to which TPS was relying on form language and to conduct training for all special education staff through an approved plan.[42]  TPS has not publicly reported what progress, if any, it has made to address the OSDE-SES's order.

137.    J.I. is a victim of Defendant TPS's inability, or unwillingness, to properly address

---

*Gordon Leland, and Cynthia Leland, Individually and as gen. guardian of the person and estate of Daniel Gordon Leland v. Kevin R. Short, in his off. and individual capacity, Shelly Holman, in her off. and individual capacity, Indep. Sch. Dist. No. 1 of Tulsa Cnty.*, No. 4:16cv142 (N.D. Okla. filed Mar. 15, 2016); Joint Stipulation of Dismissal with Prejudice, *Ricky Leland, Individually and as gen. guardian of the person and estate of Daniel Gordon Leland, and Cynthia Leland, Individually and as gen. guardian of the person and estate of Daniel Gordon Leland v. Kevin R. Short, in his off. and individual capacity, Shelly Holman, in her off. and individual capacity, Indep. Sch. Dist. No. 1 of Tulsa Cnty.*, No. 4:16cv142 (N.D. Okla. Jun. 29, 2017) (ECF 51);
[41] State Compl. 19-19, Okla. State Dept. of Educ. Special Educ. Servs. (2019).
[42] *Id.*

IEPs and the care needed to protect disabled students.  As a result, he suffered criminal assault at the hands of a TPS employee.

138.    Defendant TPS either failed to inform its employees, namely Defendant Stowell, about J.I.'s IEP, or it failed to instruct personnel as to how to address and respect J.I.'s IEP.  In either case, Defendant TPS's failure to pay proper care to J.I.'s IEP resulted in criminal abuse of a student in its care.

139.    Defendant TPS's failure to adequately train personnel is ongoing.  A February 2025 Special Audit Report into Defendant TPS's finances found that the Tulsa Teacher Corps program, which launched in the summer of 2018 as an effort to expedite teacher certification, operated for two years prior to receiving official authorization through legislation and the State Board of Education.  In that time, the Teacher Corps trainees provided instruction in summer classrooms without meeting the necessary statutory requirements.[43]  "The participants did not have written contracts, were yet to be properly certified [to teach in the classroom], and not all of the participants had obtained the required OSBI background check, all requirements of law."[44]  TPS's willingness to unlawfully shortcut the certification process in response to declining teacher retention[45] paints a grim picture as to what other training measures TPS is willing to forgo to keep its schools adequately staffed.

## V.    CAUSES OF ACTION

### COUNT I
**Disability-Based Discrimination and Failure to Accommodate in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(3), (8)**

140.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully

---

[43] Cindy Byrd, *Tulsa Public Schools Special Audit Report*, State Auditor & Inspector 1, 26 (2025), sai.ok.gov/Search%20Reports/database/TPS% 20Audit%20Report%20web%20final.
[44] *Id.*
[45] *Id.* at 25.

set forth herein.

141.    Due to J.I.'s ADHD, anxiety, and PTSD diagnoses, which substantially limit his major life activities, he qualifies as "an individual with a disability" within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2) and falls into the class of persons whose rights are specifically protected by this statute.

142.    Defendant TPS is a "public entity" as defined in 42 U.S.C. § 12131(1) and so is covered by Title II of the ADA.

143.    Defendant TPS discriminated against J.I. by failing to properly train its employees, including Defendant Stowell, on its students' disabilities and how to engage with disabled students.

144.    Defendant TPS was on notice of the need for additional or different, targeted training for its staff to avoid substantially likely harm to its disabled students' federally protected rights.

145.    Defendant TPS's failure to properly train its employees, including Defendant Stowell, was both obvious and clearly unreasonable under the circumstances and amounted to deliberate indifference to the likelihood that J.I.'s federally protected rights would be violated.

146.    Defendant TPS's failure to properly train its employees, including Defendant Stowell, amounted to a denial of the benefits of TPS's services to students with disabilities.

147.    Defendant Stowell's criminal assault on J.I. was in direct contravention of the procedures outlined in the April 2023 IEP, which Defendant TPS failed to implement.

148.    Upon J.I.'s enrollment at Wayman Tisdale, Defendant TPS knew that J.I. needed the accommodations outlined in the April 2023 IEP as Defendant TPS was aware of the April 2023 IEP's existence.

149.    Defendant TPS was further aware that failure to implement the accommodations in the April 2023 IEP would result in harm to J.I.'s federally protected right to receive equal access

to TPS's services, and yet Defendant TPS failed to ensure that its employees, including Defendant Stowell, complied with the April 2023 IEP.

150.    It would not have constituted an undue burden or hardship for Defendant TPS to properly implement the April 2023 IEP, and Defendant TPS's failure to do so was clearly unreasonable and amounted to deliberate indifference.

151.    Defendant TPS failed to reevaluate the April 2023 IEP or provide J.I. with an FBA upon his enrollment at Wayman Tisdale, despite the fact that Defendant TPS was aware that J.I. had been placed in psychiatric care between the April 2023 IEP's creation and his enrollment at Wayman Tisdale.

152.    Defendant TPS was aware that failure to reevaluate the April 2023 IEP would deny J.I. the updated accommodations that he required and that it was substantially likely that failing to reevaluate and update the April 2023 IEP would result in harm to J.I.'s federally protected right to access Defendant TPS's services, and yet Defendant TPS failed to update the April 2023 IEP.

153.    It would not have constituted an undue burden or hardship for Defendant TPS to reevaluate J.I.'s needs to ensure that the programs in place for him met his needs.  Its failure to undertake this assessment in light of the apparent deficiency of the April 2023 IEP was clearly unreasonable and amounted to deliberate indifference.  This is evidenced by Defendant TPS's creation of the September 2025 IEP and the September 2025 BISP that were implemented for J.I. during the 2025-2026 academic year.

154.    Defendant TPS further failed to modify J.I.'s IEP following Stowell's violent attack.  Defendant TPS was aware that J.I.'s IEP needed to be reevaluated because Defendant TPS was aware of the attack, knew it was in contravention of the then-in place April 2023 IEP, and knew that J.I. was facing increased challenges in school following the attack.

155.    Defendant TPS was aware that failing to modify J.I.'s IEP in the wake of Stowell's

attack was a failure to accommodate J.I. that would substantially likely harm J.I.'s federally protected right to equal access to TPS's services.

156.    It would not have constituted an undue burden or hardship for Defendant TPS to modify J.I.'s IEP following Stowell's assault and its failure to do so was clearly unreasonable, amounting to deliberate indifference.  This is evidenced by Defendant TPS's creation of the September 2025 IEP and the September 2025 BISP that were implemented for J.I. during the 2025-2026 academic year.

157.    Further, Defendant TPS failed to make accommodations for J.I. following Defendant Stowell's attack because Wayman Tisdale did not want to keep J.I. enrolled as a student by reason of his Disabilities.  Through the representations of its employees, TPS made clear that accommodating J.I. was too much work—work that TPS did not want to do, regardless of its federal mandate.

158.    Numerous TPS administrators, officials, and employees had the authority and responsibility to rectify Defendant TPS's failures, as set forth above, but wrongfully failed to take appropriate corrective action.

159.    Following Stowell's criminal attack, J.I. sought to continue his education at Wayman Tisdale, but Defendant TPS's attempts to cover up the assault were intended to deny J.I. the benefits of TPS's services.

160.    Defendant TPS was aware that J.I. had been physically assaulted by Defendant Stowell as of February 9, 2024.

161.    Defendant TPS was, at all relevant times, aware of J.I.'s Disabilities, his placement in an out-patient program immediately before his enrollment at Wayman Tisdale, as well as his past experiences with trauma.  Defendant TPS was therefore aware that without an appropriate response, J.I. would be unable to continue to attend Wayman Tisdale following the compounded

36

trauma of Defendant Stowell's attack.

162.    Defendant TPS failed to timely document or record the abuse against J.I., failed to investigate the circumstances leading up to the abuse, and actively and intentionally concealed the abuse from Plaintiff and the on-site therapist that Defendant TPS charged with caring for J.I. immediately after the assault—the adults best positioned to advocate for J.I.—thus ensuring that no appropriate or timely response could occur.

163.    Following Defendant Stowell's criminal abuse, Defendant TPS affirmatively failed to provide J.I. services to ensure his continued or meaningful access to TPS's public services.

164.    Defendant TPS failed to immediately update the April 2023 IEP following Stowell's assault, despite Stowell's clear violation of the April 2023 IEP—an indication that the April 2023 IEP was not, in fact, sufficiently protecting J.I.'s rights.  Defendant TPS continued to use the April 2023 IEP for the remainder of the 2023-2024 school year, despite J.I. continuing to struggle with his behavioral regulation in school.

165.    Defendant TPS, through statements from its representatives repeatedly communicated to Plaintiff after Defendant Stowell's assault that it was unwilling to make the reasonable modifications and did not want to accommodate J.I.'s Disabilities.

166.    J.I.'s lack of access to Defendant TPS's public services was a reasonable and foreseeable consequence of Defendant TPS's failure to conduct an investigation into Defendant Stowell's criminal abuse or otherwise seek to ensure that J.I. received the medical, emotional, and educational attention he needed.

167.    As a direct and proximate result of Defendant TPS's actions and inactions, J.I. suffered physically and emotionally due to Defendant Stowell's assault and continues to exhibit anxiety, decreased emotional regulation and communication skills, and a fear of authority figures, particularly school staff and teachers, to this day.

168.    As a direct and proximate result of Defendant TPS's actions and inactions, Plaintiff has been required to incur expenses for medical and psychological/psychiatric care for J.I. in an amount to be determined at trial and will be required to incur expenses in the future for J.I.'s medical and psychological/psychiatric care and treatment.

169.    As a direct and proximate result of Defendant TPS's actions and inactions, Plaintiff has been required to incur expenses to care for J.I. while he attended online schooling for the 2024-2025 academic year in an amount to be determined at trial.

170.    As a result of Defendant TPS's violations of Title II of the ADA and § 504 through its failure to train its staff, including Defendant Stowell, repeated failures to accommodate J.I.'s Disabilities, and denial of access to its public services to J.I. through its failure to appropriately respond to Defendant Stowell's assault, J.I. is entitled to compensatory damages and reasonable attorneys' fees and costs.

**COUNT II**
**Disability-Based Discrimination and Failure to Accommodate in Violation of Section 504 of the Rehabilitation Act of 1973, Against Tulsa Public Schools**

171.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

172.    Due to J.I's ADHD, anxiety, and PTSD diagnoses, which substantially limit his major life activities, he qualifies as "an individual with a disability" within the meaning of the § 504 of the Rehabilitation Act of 1973 ("§ 504"), 29 U.S.C. § 794 and falls into the class of persons whose rights are specifically protected by this statute.

173.    § 504 forbids programs that receive federal financial assistance from discriminating against individuals with a disability solely because of their disability.  29 U.S.C. § 794(a).

174.    Defendant TPS receives federal financial assistance.

175.    The substantive standards of Count I, violation of Title II of the ADA and § 504

claims are the same. Thus, for the same reasons as discussed in ¶¶ 140-170 Defendant TPS violated § 504.

176.    Defendant TPS discriminated against J.I. solely as a result of his disability.

177.    Through failing to properly train its employees, including Defendant Stowell, on how to properly engage with disabled students, despite being on notice that this lack of training was substantially likely to harm disabled students' federally protected rights, Defendant TPS's conduct was clearly unreasonable and amounted to intentional discrimination.

178.    Through failing to develop and implement reasonable accommodations that Defendant TPS knew J.I. required, Defendant failed to act despite knowing that J.I.'s federally protected rights were substantially likely to be violated. Such inaction was clearly unreasonable and amounted to deliberate indifference. As a result, J.I. was, in fact, excluded from participation in, and denied him the benefits of Defendant TPS's services.

179.    Through failing to investigate Defendant Stowell's assault and refusing to provide J.I. accommodations that TPS knew he needed to continue receiving its benefits, with the explicit and states intention of preventing J.I. from accessing its services because of his Disabilities, Defendant TPS discriminated against J.I.

180.    As a direct and proximate result of Defendant TPS's actions and inactions, J.I. suffered physically and emotionally due to Defendant Stowell's assault and continues to exhibit anxiety, decreased emotional regulation and communication skills, and a fear of authority figures, particularly school staff and teachers, to this day.

181.    As a direct and proximate result of Defendant TPS's actions and inactions, Plaintiff has been required to incur expenses for medical and psychological/psychiatric care for J.I. in an amount to be determined at trial and will be required to incur expenses in the future for J.I.'s medical and psychological/psychiatric care and treatment.

182.     As a direct and proximate result of Defendant TPS's actions and inactions, Plaintiff has been required to incur expenses to care for J.I. while he attended online schooling for the 2024-2025 academic year in an amount to be determined at trial.

183.     As a result of Defendant TPS's violations of Title II of the ADA and § 504 through its failure to train its staff, including Defendant Stowell, repeated failures to accommodate J.I.'s Disabilities, and denial of access to its public services to J.I. through its failure to appropriately respond to Defendant Stowell's assault, J.I. is entitled to compensatory damages, and reasonable attorneys' fees and costs.

## COUNT III

**Violation of Civil Rights Under 42 U.S.C. § 1983, Fourteenth Amendment of the United States Constitution Substantive Due Process, Against Nicholas Stowell in his Individual Capacity**

184.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

185.     On February 9, 2024, Defendant Stowell was an agent of Defendant TPS, acting under the color of law, and used excessive force on J.I. by restraining, dragging, and assaulting J.I. in an excessively forceful manner.

186.     Defendant Stowell's use of force against J.I. was a brutal and inhumane abuse of power that shocks the conscience.

187.     Defendant Stowell grabbed, dragged, and slammed J.I. onto the hard surface of a picnic table bench, and then placed J.I. in an apparent headlock.

188.     Following Defendant Stowell's assault, J.I. experienced pain in his leg.  The full extent of J.I.'s physical injuries cannot be determined because Defendant TPS concealed the assault, delaying J.I.'s access to medical attention until four days after the assault.  Even so, J.I. experienced physical pain, fear, and an immediate regression in his ability to communicate and

emotionally regulate. The trauma from the assault has exacerbated J.I.'s manifestations of his Disabilities, and he continues to experience decreased emotional regulation and communication skills, PTSD, as well as a fear of authority figures, particularly school staff and teachers to this day.

189.    Defendant Stowell's use of restraint against J.I. was excessive and disproportionate to the needs presented because, including but not limited to:

    (1)    At the time of the assault, J.I. was seven years old and 4' 1" tall, and weighed around 55 pounds;

    (2)    At the time of the assault, J.I. posed no immediate threat to himself, or those around him;

    (3)    The April 2023 IEP explicitly instructed against the use of punitive consequences;

    (4)    Defendant Stowell's attack on J.I. was ultimately deemed to be felony child abuse;

    (5)    Upon information and belief, Defendant Stowell was aware of J.I.'s Disabilities and background and understood that J.I. may not be able to understand why force was being used against him and whether that force was appropriate, leading to an increased risk of harm and trauma.

190.    Defendant Stowell's use of excessive force against J.I. was not the result of unwise or excess zeal. Defendant Stowell's assault on J.I. lasted for an extended period and spanned across multiple locations, from the playground to the picnic bench. J.I. did not resist Stowell's assault at first, and when he did, Stowell escalated his use of force against J.I. These facts indicate that Defendant Stowell was inspired by malice when he attacked J.I.

191.    At the time of Defendant Stowell's conduct, it was clearly established law in the

Tenth Circuit that excessive corporal punishment could deny the substantive due process rights of students.

192.    As a direct and proximate result of Defendant Stowell's unconstitutional actions, J.I. suffered physically and emotionally and continues to exhibit anxiety, decreased emotional regulation and communication skills, and a fear of authority figures, particularly school staff and teachers, to this day.

193.    As a result of Defendant Stowell's violation of the Substantive Due Process of the Fourteenth Amendment to the U.S. Constitution, J.I. is entitled to compensatory damages and reasonable attorneys' fees and costs.

194.    Defendant Stowell acted with evil motive or intent or was aware that his use of excessive force against J.I. risked violating J.I.'s federally protected rights and he acted with reckless or callous indifference to that right.

**COUNT IV**

**Violation of Civil Rights Under 42 U.S.C. § 1983, Fourth Amendment to the United States Constitution, Against Nicholas Stowell in his Individual Capacity**

195.    Defendant Stowell unreasonably and unconstitutionally seized J.I.

196.    Defendant Stowell's dragging and grabbing of J.I. around his chest and neck was a restriction on J.I.'s movement that was greater than most students experience.

197.    Defendant Stowell's restraint of J.I. was unreasonable considering the totality of the circumstances because, including but not limited to:

(1)    At the time of the assault, J.I. was seven years old, 4' 1" tall, and weighed around 55 pounds;

(2)    At the time of the assault, J.I. posed no immediate threat to himself, or those around him;

(3)    At the time of the assault, J.I. was not resisting Stowell or attempting to flee the School's premises;

(4)    The April 2023 IEP instructed against the use of punitive consequences;

(5)    Defendant Stowell did not seriously attempt to use less restrictive means to engage with J.I. prior to seizing him; and

(6)    Defendant Stowell's attack on J.I. was ultimately deemed to be felony child abuse.

198.    Defendant Stowell's seizure of J.I. was not justified at its inception, and was extremely disproportionate to any actions by J.I.  Defendant Stowell's seizure was not reasonably related in scope to the circumstances—if any—that required interference in the first instance.  The seizure lasted for an extended period of time, including after Defendant Stowell had removed J.I. from the playground and completely isolated him at the picnic table.  There was no discernable safety, educational, or behavioral objective in restraining J.I. in this manner.

199.    J.I.'s right to be free from unreasonable seizure as described herein was clearly established by Tenth Circuit law at the time that Defendant Stowell grabbed him, dragged him, and slammed him repeatedly onto the picnic bench.

200.    Defendant Stowell's actions were a brutal and inhumane abuse of power that inflicted both physical and emotional injuries of such severity, and that were so grossly disproportionate to any need, that they violated basic principles of justice.

201.    As a direct and proximate result of Defendant Stowell's unconstitutional actions, J.I. suffered physically and emotionally and continues to exhibit anxiety, decreased emotional regulation and communication skills, and a fear of authority figures, particularly school staff and teachers, to this day.

202.    As a result of Defendant Stowell's violation of the of the Fourth Amendment to the

U.S. Constitution, J.I. is entitled to compensatory damages and reasonable attorneys' fees and costs.

203.    Defendant Stowell acted with evil motive or intent or was aware that his seizure of J.I. risked violating J.I.'s federally protected rights and he acted with reckless or callous indifference to that right.

**COUNT V**
**Violation of Civil Rights Under 42 U.S.C. § 1983, Fourteenth Amendment to the United States Constitution Substantive Due Process, Against Tulsa Public Schools**

204.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

205.    At all material times, Defendants were acting under the color of law.

206.    Defendant TPS's practice of using unnecessary and excessive force to restrain students, particularly students with disabilities, is part of a longstanding pattern or custom which constitutes the standard operating procedure of TPS.

207.    The persistent and widespread utilization of excessive force to restrain students, particularly disabled students, is ratified and enforced by Defendant TPS. Defendant TPS has consistently failed to rectify the myriad abuses, problems, and delinquencies by teachers and staff, of which it has had consistent and clear awareness.

208.    Defendant Stowell's assault on J.I. was the result of his deliberate choice and was carried out pursuant to and in accordance with the unconstitutional pattern or custom established by Defendant TPS.

209.    Defendant TPS's pattern or custom of unconstitutional excessive force against its students caused the unconstitutional injuries that J.I. suffered at Defendant Stowell's hands.

210.    By engaging in the acts described herein, Defendant TPS, acting under color of law and with deliberate indifference to the unconstitutional threat that its pattern or custom posed to

students, violated J.I.'s right under the U.S. Constitution to be free from excessive force.

211.    Defendant TPS was deliberately indifferent to J.I.'s civil rights by failing to properly train, supervise, or correct its employees, including Defendant Stowell, giving rise to the assault of J.I. in violation of his civil rights.

212.    Defendant TPS's failure to adequately train, supervise, or correct its employees was the moving force behind Defendants' collective deprivations of J.I.'s civil rights under the color of law.

213.    J.I. has a right to be free from Defendant TPS's unconstitutional lack of adequate training and supervision of its employees.

214.    Defendant TPS was aware of historically similar unlawful conduct against students by teachers and staff and was deliberately indifferent to the threat of unconstitutional violations that its failure to improve the training and supervision of its employees presented.  Defendant TPS failed to remedy this pattern of behavior and allowed for constitutional deprivations by its agent in the physical assault and abuse of J.I.  This failure to act was unreasonable under the circumstances.

215.    This failure led to J.I.'s constitutional deprivation and other injuries.

216.    As a direct and proximate result of Defendant TPS's unconstitutional actions, J.I. suffered physically and emotionally and continues to exhibit anxiety, decreased emotional regulation and communication skills, and a fear of authority figures, particularly school staff and teachers, to this day.

217.    As a result of Defendant TPS's violation of the of the Fourteenth Amendment to the U.S. Constitution, J.I. is entitled to compensatory damages and reasonable attorneys' fees and costs.

**COUNT VI**

**Violation of Civil Rights Under 42 U.S.C. § 1983, Fourth Amendment of the United States Constitution, Against Tulsa Public Schools**

218.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

219.    At all material times, Defendants were acting under the color of law.

220.    Defendant TPS's practice of unreasonably seizing students, particularly students with disabilities, is part of a longstanding pattern or custom which constitutes the standard operating procedure of TPS.

221.    The persistent and widespread utilization of unreasonable seizures of students, particularly disabled students, is ratified and enforced by Defendant TPS. Defendant TPS has consistently failed to rectify the myriad abuses, problems, and delinquencies by teachers and staff, of which it has had consistent and clear awareness.

222.    Defendant Stowell's seizure of J.I. was the result of his deliberate choice and was carried out pursuant to and in accordance with the unconstitutional pattern or custom established by Defendant TPS.

223.    Defendant TPS's pattern or custom of unconstitutional unreasonable seizures of its students caused the unconstitutional injuries that J.I. suffered at Defendant Stowell's hands.

224.    By engaging in the acts described herein, Defendant TPS, acting under color of law and with deliberate indifference to the unconstitutional threat that its pattern or custom posed to students, violated J.I.'s right under the U.S. Constitution to be free from unreasonable seizures.

225.    Defendant TPS was deliberately indifferent to J.I.'s civil rights by failing to properly train, supervise, or correct its employees, including Defendant Stowell, giving rise to the assault of J.I. in violation of his civil rights.

226.    Defendant TPS's failure to adequately train, supervise, or correct its employees was

the moving force behind Defendants' collective deprivations of J.I.'s civil rights under the color of law.

227.    J.I. has a right to be free from Defendant TPS's unconstitutional lack of adequate training and supervision of its employees.

228.    Defendant TPS was aware of historically similar unlawful conduct against students by teachers and staff and was deliberately indifferent to the threat of unconstitutional violations that its failure to improve the training and supervision of its employees presented.  Defendant TPS failed to remedy this pattern of behavior and allowed for constitutional deprivations by its agent in the seizure, physical assault, and abuse of J.I.  This failure to act was unreasonable under the circumstances.

229.    As a direct and proximate result of Defendant TPS's unconstitutional actions, J.I. suffered physically and emotionally and continues to exhibit anxiety, decreased emotional regulation and communication skills, and a fear of authority figures, particularly school staff and teachers, to this day.

230.    As a result of Defendant TPS's violation of the of the Fourth Amendment to the U.S. Constitution, J.I. is entitled to compensatory damages and reasonable attorneys' fees and costs.

## VI.    JURY DEMAND

231.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.  In accordance with the Federal Rules, this jury demand is being filed with the Clerk of the United States District Court for the Northern District of Oklahoma.

## VII.    PRAYER FOR RELIEF

232.    WHEREFORE, Plaintiff requests that this Court enter a judgment on their behalf

against the Defendants jointly and severally, as follows:

      a.   Awarding actual and compensatory damages for J.I. including but not limited to physical, mental, and emotional injury resulting from the acts complained of herein in an amount to be determined at trial;

      b.   Awarding compensatory damages for Plaintiff for medical bills, counseling, and other costs and expenses for past and future medical and psychological care for J.I. stemming from Defendant TPS's violations of Title II of the ADA and § 504;

      c.   Awarding punitive damages as to Defendant Stowell;

      d.   Awarding reasonable attorneys' fees and all costs of these proceedings pursuant to 42 U.S.C. § 1988;

      e.   Pre and post judgment interest;

      f.   Awarding any and all other relief which this honorable Court deems proper.

233.   Plaintiff further reserves the right to amend or supplement this complaint upon discovery of any additional fact, law, or claim, the amendment of which is to be performed by the filing of any subsequent pleading.

Respectfully submitted,


s/ *Damario Solomon-Simmons*
Damario Solomon-Simmons, OBA #20340
SOLOMON SIMMONS LAW
601 S. Boulder, Ste. 602
Tulsa, Oklahoma 74119
918-551-8899
dss@solomonsimmons.com

Karin Portlock (*pro hac vice* forthcoming)
Mary Otoo (*pro hac vice* forthcoming)
Jerelyn Luther (*pro hac vice* forthcoming)
Katie Zavadski (*pro hac vice* forthcoming)
Ingrid V. Cherry (*pro hac vice* forthcoming)
Morgan A. Carter (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
kportlock@gibsondunn.com
motoo@gibsondunn.com
jluther@gibsondunn.com
kzavadski@gibsondunn.com
icherry@gibsondunn.com
mcarter@gibsondunn.com

Sonia K. Ghura (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
sghura@gibsondunn.com


*Counsel for Plaintiff Shanta Isom, individually
and as next friend to minor J.I.*